USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-1462 UNITED STATES, Appellee, v. MARIA MULINELLI-NAVAS, Defendant - Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Jose Antonio Fuste, U.S. District Judge] ____________________ Before Torruella, Chief Judge, Coffin and Campbell, Senior Circuit Judges. _____________________ Linda  Backiel, with whom Luis F. Abreu-Elias was on brief for appellant. Maria A. Dominguez, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, Jose A. Quiles- Espinosa, Senior Litigation Counsel, and Nelson Perez-Sosa, Assistant United States Attorney, were on brief for appellee. ____________________ May 23, 1997 ____________________ AMENDED ____________________ TORRUELLA, Chief Judge. On August 9, 1995, Maria Mulinelli-Navas  ("Mulinel li") was charged with conspiracy to commit bank fraud, in violation of 18 U.S.C. S 371, making false statements to a federally insured financial institution, in violation of 18 U.S.C. S 1014, and bank fraud, in violation of 18 U.S.C. S 1344. On December 21, 1995, a jury returned a guilty verdict on all counts and she was subsequently sentenced to 27 months for each count, to be served concurrently, and three years supervised release. Mulinelli appeals only her convictions, claiming that: (1) the district court's limitation on her cross- examination  of her accomplices deprived her of her Sixth Amendment right to confrontation; (2) the district court abused its discretion by not allowing Mulinelli to introduce extrinsic evidence to impeach an accomplice; (3) the district court abused its discretion by admitting into evidence an improperly authenticated summary chart; and (4) the district court, by overruling certain objections, deprived her of the ability to present  her  defense  to  the jury. For the reasons stated herein, we vacate Mulinelli's conviction and sentence on Counts V and VI and affirm as to all other issues. BACKGROUND The  jury  could  have  found the following facts. Mulinelli was  Senior  Vice President of First Federal Savings Bank, in charge of  car  loans. Between 1985 and 1988, First Federal approved loans to two dealers who, in fact, neither bought nor sold the cars for which the loans were made. Furthermore, these loans involved -2- irregular financing, with low monthly payments and large balloon payments at the end of one year. The indictment charged Mulinelli with conspiring to approve  fraudulent loans of $25,000 in 1985 and $273,000 from 1987 to 1988 to Lopez, and $130,000 in June 1988 to Exposito. At trial, the two auto dealers testified. One of the auto  dealers, Luis Lopez-Mendoza ("Lopez"), President and owner of Cordillera  Auto,  testified that he was approached by Mulinelli with a request that he loan her money. In response to his statement that he was not in the business of lending money, Mulinelli suggested  a  financing scheme by which Lopez would apply for a loan on a non-existent car. According to the loan documents and disbursement check, the loan was taken out in the name of Mulinelli's daughter for a Volvo station wagon that was never actually purchased. They carried out the scheme she described: upon receiving the loan check, he deposited the amount, then gave Mulinelli a $25,000 loan from cash on hand at his business. Mulinelli's daughter testified that she signed for a $25,000 loan to  purchase  a family car that Mulinelli put in the daughter's name because  of  credit problems. She testified that the handwriting on the sales contract "looked like my mother's." In 1985, Lopez approached Mulinelli about obtaining financing of a type not available from First Federal. Mulinelli suggested a similar scheme, whereby Lopez would execute blank contracts, stamped with the seal of Cordillera Auto and would deliver the blank documents to Mulinelli for her approval. Lopez -3- used these loans to finance cars he was purchasing for eventual resale. A similar strategy was used to provide loans to another dealer,  Lazaro Exposito Cordoves ("Exposito"), President of Caguas Auto  Wholesale.   Both  Lopez and Exposito testified that they signed and sealed blank forms for car sales contracts, which they delivered to the bank for completion. During his testimony, Lopez recanted statements made in an earlier affidavit, in which he denied that Mulinelli had knowledge of the fraud. He testified that he lied because the attorney to whom he made the affidavit told him, before starting the tape recorder, that the attorney's purpose was to "protect" Mulinelli. The defense sought to introduce the testimony of the attorney regarding whether he actually stated that the purpose of his  meeting  with  Lopez  was to protect Mulinelli. After hearing the attorney's  proposed testimony out of the presence of the jury, the trial court upheld the prosecution's objection that his testimony was extrinsic evidence on a "collateral matter" and thus was inadmissible. Exposito  testified  about  two loans made in 1988 to Caguas Auto Wholesale, purportedly to finance purchases for a rental business ("Zoom") that Exposito never established. Exposito approached Mulinelli and informed her that he needed money. She told  him  to  bring her contracts and bills of sale for cars that he would  sell  from his dealership to this sham car rental business so that she could approve loans for their purchase. For the first loan,  Mulinelli requested that Exposito provide her with a bill of -4- sale and a loan application reflecting the sale of cars that he never purchased. Two hours after he delivered the documents to Mulinelli, the loan was approved and he received a check in the amount  of  $60,000. Exposito used the funds to buy other cars that were not pledged as collateral for the loan. He also signed and sealed blank sales contracts and delivered them directly to Mulinelli. Exposito testified that Mulinelli knew the cars referred  to  in  the  two  loan applications were not in Puerto Rico at the time the loans were made and that he had no intention of selling the cars to Zoom but rather that he intended to use the money  to  buy  other cars. Moreover, Mulinelli determined the terms of  these  loans,  which  included large balloon payments at the end of the year. In return for her assistance with the loans, he made a personal  loan to Mulinelli for $5,000 and did some personal favors for her and her family. DISCUSSION I. The district court's limitation of Mulinelli's cross- examination of Lopez and Exposito At trial, Mulinelli's counsel cross-examined Lopez regarding the benefits and conditions of his plea agreement. Mulinelli  entered into evidence the information by which Lopez was charged and the plea agreement under which he pled guilty to conspiracy  to  commit  bank fraud. Mulinelli elicited testimony from Lopez  that  he was not and would not be charged with bank fraud, in addition to his conspiracy charge, as Mulinelli had been charged. Lopez also testified that, as part of his plea bargain agreement, the United States Attorney would make a recommendation for a -5- reduction in his sentence. The district court, however, cut off Mulinelli's counsel when on several occasions he tried to elicit testimony  from  Lopez  regarding the possible sentence he faced. The district court noted that matters of sentencing were in the sound discretion of the district court judge who was scheduled to sentence Lopez. Mulinelli elicited similar testimony from Exposito regarding the substance of the plea agreement -- that he expected the United States Attorney to make a recommendation for the district court's consideration in his sentencing, that he was not charged with bank fraud, but only with conspiracy and making a false statement to a financial institution, and that he would not be  charged  with  any  other crimes. Again, the district court barred Mulinelli from eliciting testimony regarding the nature of the sentence Exposito expected to receive. Mulinelli argues on appeal that the district court's limitation on her cross-examination regarding the potential sentence  that  both  accomplices faced before and after entering into the plea agreements so interfered with her ability to effectively cross-examine the witnesses that it violated her Sixth Amendment right to confrontation. The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted  with  the  witnesses against him." U.S. Const. amend. VI. "[T]he right of a defendant in a criminal case to establish the bias of witnesses against him through cross-examination is an -6- important  component  of  the Sixth Amendment right to confrontation." United  States  v.  Jarabek , 726 F.2d 889, 902 (1st Cir. 1984) (citing Davis  v.  Alaska ,  415  U.S. 308, 315-16 (1974)). A defendant has the right to cross-examine an accomplice regarding the nature of and benefits, including unprosecuted crimes, afforded under the plea agreement. United States v. Barrett, 766 F.2d 609, 614 (1st Cir. 1985). Although this right is extensive, it is not absolute or unlimited.   Once  the  defendant has been afforded the constitutional minimum of an opportunity for effective cross-examination, the trial  court  "retain[s]  wide latitude to impose reasonable limits on such  cross-examination  based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant."   Delaware  v.  V an Arsdall, 475 U.S. 673, 679 (1986). "An abuse of discretion has occurred only if the jury is left without 'sufficient information concerning formative events to make a "discriminating appraisal" of a witness's motives and bias.'" United States v. Twomey, 806 F.2d 1136, 1140 (1st Cir. 1986) (quoting United States v. Campbell, 426 F.2d 547, 550 (2d Cir. 1970)). We find no such abuse here. During direct and cross- examination  of both Lopez and Exposito, the jury was apprised that they  were  not  charged  with bank fraud, one of the charges Mulinelli faced. On cross-examination, Mulinelli was able to elicit information regarding their plea agreements, including that the accomplices expected the government to make a beneficial -7- recommendatio n to the sentencing judge based on their cooperation, and  that  they were granted immunity from prosecution for any other crimes related to their testimony. The jury could infer from the circumstances that the accomplices had avoided being charged with offenses carrying greater sentences by testifying in the government's case. Mulinelli was able, through her cross- examination, to expose the biases and motivations of the accomplices to favor the government and, once this threshold was met,  the  district court's limitation was not improper. As we find that  the  jury  had  before  it sufficient information on which to make a  discriminating appraisal of the accomplices' motives and biases, we find no abuse of discretion. Additionally, Mulinelli's counsel sought to elicit sentencing  information regarding the charges the accomplices faced and avoided by pleading guilty to conspiracy. Had Mulinelli successfully elicited this information, the potential punishment she  faced,  should the jury find her guilty, would have been before the  jury.   The actions taken by the district court to prevent this information,  which could confuse the issues presented to the jury, from reaching the jury were thus entirely proper. See United States v. Alvarez, 987 F.2d 77, 82 (1st Cir. 1993) (finding the district court did not abuse its discretion when it excluded evidence of the penalty to be imposed on an accomplice as such information  might  mislead or confuse the jury, "particularly where, as  here,  the  witness sought to testify to the same penalties faced by the defendants"). -8- II. District court's decision not to allow Jerome Murray to testify During his cross-examination, Lopez referred to an interview he had prior to the prosecution of this case with an attorney named Jerome Murray ("Murray"). Lopez' trial testimony regarding his interactions with Mulinelli differed from the responses he had given during his interview with Murray, and he stated that he lied during that interview because Murray told him that the purpose of the interview was to "protect" Mulinelli. Defense counsel stated that he wished to have Murray testify to impeach  Lopez' testimony that Murray told Lopez that the interview was intended to "protect" Mulinelli. The trial court refused to allow Murray to testify. Murray's testimony would have gone to the question whether Lopez was lying about what Murray had said before the interview,  and  therefore  related to Lopez' credibility. On appeal, Mulinelli  contends that the district court usurped the jury's role in making credibility determinations and thereby abused its discretion.   Although  the use of contradictory testimony is a valid means of impeachment, it is limited in several important ways. United  States v. Payne, 102 F.3d 289, 294 (7th Cir. 1996). One of these  limitations is the collateral issue rule, which bars a party from  impeaching  a  witness on a collateral matter through the use of extrinsic  evidence.   Unit ed States v. Beauchamp, 986 F.2d 1, 3 (1st Cir.  1993)  ("[W]hen  a  witness testifies to a collateral matter, the examiner 'must take [the] answer,' i.e., the examiner may not disprove it by extrinsic evidence."). "A matter is considered -9- collateral  if 'the matter itself is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for a purpose  other than mere contradiction of the in-court testimony of the  witness.'" Id. at 4 (quoting 1 McCormack on Evidence S 45, at 169). In other words, "[a] matter is collateral if it could not have been introduced into evidence for any purpose other than contradiction. . . . [T]he evidence must have an independent purpose  and  an independent ground for admission." Payne, 102 F.3d at 294 (citation and internal quotation marks omitted); see also United States v. Roulette, 75 F.3d 418, 423 (8th Cir.), cert. denied ,  117  S.  Ct.  147  (1996). The inquiry into what is collateral is  squarely  within the trial court's discretion. United States v. Kozinski, 16 F.3d 795, 806 (7th Cir. 1994). In light of the collateral issue rule, in order to be admissible, Murray's offered testimony must not only contradict a statement  of  Lopez',  but  must also be material to Mulinelli's guilt or innocence. Mulinelli fails, however, to indicate any independent  and  material  ground for admitting Murray's testimony as to  what  he  told  Lopez  at  the time of the interview. See Payne, 102 F.3d at 295 (noting that defendant's proffer for the purpose of impeaching  a  witness was collateral, as it did not directly relate to substantive issues concerning his guilt or innocence, and therefore was inadmissible); see also United States v. Zuno-Arce, 44 F.3d 1420, 1422-23 (9th Cir.) (where accomplices testifying on behalf of the government presented contradictory testimony, trial court  acted  within  its  discretion in determining that "whether they -10- lied, or erred in their perceptions or recollections" were questions of credibility for the jury), cert. denied, 116 S. Ct.  383  (1995).   The  district court did not abuse its discretion in excluding Murray's testimony, which was relevant only to Lopez' credibility on a matter immaterial to Mulinelli's guilt. III. Evidentiary rulings A. Admission of the summary chart The government's first witness was Fernando Iglesias Iglesias ("Iglesias"), an auditor for First Federal, whose investigation of First Federal's unusual car loan transactions led to Mulinelli's indictment. During direct examination, the government moved to admit a summary chart that Iglesias had prepared during the course of his investigation, based upon information  he gleaned from bank loan records. Mulinelli objected to the admission of the summary chart, arguing that the chart was not  an  original.   On  appeal, she changes her position, arguing that the summary chart was not properly qualified under the business record  hearsay exception. See Fed. R. Evid. 803(6). When a party raises  on  appeal an argument she failed to present to the district court, she has forfeited the argument and can only obtain a favorable  ruling upon a showing of plain error. See United States v.  Smith ,  101 F.3d 202 (1st Cir. 1996) (explaining that failure to argue, at time of objection, grounds offered on appeal results in plain error review), cert. denied, ___ S. Ct. ___, 1997 WL 106695 (Mar. 31, 1997). Mulinelli must show that the error "resulted in a miscarriage of justice or seriously affected the fairness, -11- integrity or public reputation of the judicial proceedings." Coastal  Fuels  of  Puerto  Rico, Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 189 (1st Cir.) (quotation marks omitted), cert. denied, 117 S. Ct. 294 (1996). The plain error standard affords reversal "only in 'exceptional cases or under peculiar circumstances to prevent a clear miscarriage of justice.'" United States v. Griffin, 818 F.2d 97, 100 (1st Cir. 1987). Mulinelli fails to indicate any error in the admission of this summary chart "so shocking that [it] seriously affect[ed] the fundamental fairness and  basic  integrity of the proceedings below." Id. Moreover, the summary  chart  probably  have been admissible as a business record as the  district  court would likely find Iglesias a "qualified person" within  the  meaning of Federal Rule of Evidence 803(6). We find no plain error. B. Admission of copy of a check During the testimony of Iglesias, the government introduced into evidence a microform copy of a check disbursing loan  funds  to Mulinelli's daughter. Mulinelli objected "only [to] the  issue  of  authenticity," Trial Transcript, Dec. 18, 1995, at 81, of the copy of the check. On appeal, Mulinelli argues that the admission  of  the microform copy was an abuse of discretion because the  government should have introduced the original and because the check was not properly authenticated. Regarding  the  admission  of the duplicate, rather than the original, the district court acted well within its discretion. Under Federal Rule of Evidence 1003, "[a] duplicate is admissible -12- to  the  same  extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." A duplicate is a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent techniques which accurately reproduces the original. Fed. R. Evid. 1001(4). The microform copy introduced here was a "duplicate"  of  the  original check and was admissible subject to the limitations of Federal Rule of Evidence 1003. Although Mulinelli objected below to the document's "authenticity" and elicited testimony that the microform was not the original, she failed to elicit any testimony or make any proffer suggesting that the original  had  been tampered with or altered in any way and that the copy was not what it purported to be. See United States v. Balzano, 687 F.2d 6, 8 (1st Cir. 1982) (declining to question authenticity of duplicate where appellant failed to proffer testimony,  beyond statement that evidence was not the original, of alteration or tampering). The duplicate complied with the requirements  of  Federal  Rule of Evidence 1003 and was admissible to the  same  extent as the original. The district court did not abuse its discretion in admitting the microform copy. Mulinelli's challenge below as to the "authenticity" of the copy does not clearly identify the argument that the copy was improperly authenticated. Nevertheless, giving Mulinelli the -13- benefit of the doubt as to the scope of her objection below, we r 1 states:   "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient  to  support  a  finding that the matter in question is what its proponent claims." Such authentication can be provided by, among  other  things, testimony of a custodian or percipient witness through "the document's '[a]ppearance, contents, substance eview  the  copy's  authentication. Federal Rule of Evidence 901(a) or , internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.'" United States v. Holmquist, 36 F.3d 154, 167 (1st Cir. 1994) (quoting Fed. R. Evid. 901(b)(4)). We  have  recognized that "[i]f the court discerns enough support in the record to warrant a reasonable person in determining that the evidence is what it purports to be, then Rule 901(a) is satisfied and the weight to be given to the evidence is left to the jury." United States v. Paolino, 13 F.3d 20, 23 (1st Cir. 1994). Iglesias' testimony regarding the conduct of the bank's loan department and surrounding the issuance of this check, which disbursed  funds for a fraudulent loan to Mulinelli's daughter, and the characteristics of the check itself, adequately authenticated 1 Mulinelli directs our attention to three cases that deal with the inadmissibility of evidence under the business records exception to the hearsay rule. See United States v. Benavente Gomez ,  921  F.2d  378  (1st  Cir. 1990); United States v. Kim, 595 F.2d 755 (D.C. Cir. 1979); United States v. Davis, 571 F.2d 1354 (5th Cir. 1978). As the inadmissibility rulings in these cases relate only to hearsay and not to authentication of evidence, they are inapposite. -14- the copy of the check, and we find no abuse of discretion in the district court's admission of the copy. C. Leading questions During the government's direct examination of Exposito, Mulinelli's counsel repeatedly objected to the leading nature of the government's questions. Mulinelli restates the objection on appeal, claiming that Exposito was not adverse or hostile to the prosecution so as to warrant leading questions, and that the court's overruling this objection limited her ability to properly cross-examine Exposito because the prosecution, rather than Exposito, was testifying. Federal Rule of Evidence 611(c) provides: Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse  party, or a witness identified with an adverse  party, interrogation may be by leading questions. "[T]he use of leading questions '. . . must be left to the sound discretion of the trial judge who sees the witness and can, therefore, determine in the interest of truth and justice whether the circumstances justify leading questions to be propounded to a witness  by  the  party  producing.'" United States v. Brown, 603 F.2d 1022, 1025 (1st Cir. 1979). Our review of the transcript reveals a witness who was, at times, unresponsive or showed a lack of understanding. The prosecutor's use of leading questions was limited to questions intended to lay a foundation for a line of -15- questioning  or  to  assist  in developing coherent testimony. We find that  such  questions were not improper and the district court acted within its discretion when it allowed this manner of questioning. See id. at 1025-26. Mulinelli also suggests that the district court improperly questioned Exposito during his testimony. The few occasions that Mulinelli points to do not suggest an abuse of discretion.   See United States v. Olmstead, 832 F.2d 642, 648 (1st Cir. 1987). The questions posed by the judge "served to . . . clarify lines of inquiry or develop the witness's answer. Such conduct is well within the court's discretion." Id. D. Limiting cross-examination as irrelevant In her attack on the prosecutor's use of leading questions, Mulinelli juxtaposes the leeway granted the prosecutor with  the  district court's curtailment of a line of questioning she sought to pursue. Mulinelli argues that her defense was that Exposito was brought to the bank by one of the bank officers, who vouched for Exposito as creditworthy, and that, thus, Mulinelli relied on the bank officer's support of Exposito. Because of her reliance, Mulinelli argues, she was duped by the two into unknowingly  providing  fraudulent bank loans to Exposito. Mulinelli argues  on  appeal that she presented this theory to the jury in her opening statement, but was unable, due to the district court's limitation on her cross-examination of Exposito, to properly present  the  theory during the course of the trial. The references -16- to this defense during her opening statement consisted of the following, separated by several pages of transcript. The evidence will show that Lazaro Exposito was brought to the bank by one of the highest officers of the bank. He did not come in by the regular channels. And the documents that were presented to the car department were brought by this highest officer of the bank. The  evidence  will show that he was recommended by this highest officer of the bank, and he started to buy repossessed automobiles, which was a department, an office under [Mulinelli] in  the  department of car loan that was managed or  directed  by a man named Otero. Of course, all under the general supervision of Mulinelli. * * * And finally, I think that the evidence, when you hear it in its totality, you will be convinced that there is a conspiracy of two crooks against Maria Mulinelli. Trial Transcript, Dec. 18, 1995, at 26-27, 30. During Mulinelli's cross-examination of Exposito, the following interchange took place: Q. Now, sir, you were not brought to First Federal in the usual way other dealers were brought in. MS. DOMINGUEZ:2 Objection as to relevance. MR. ABREU:3 It's an introductory question. THE COURT: Well -- MR. ABREU: May I make a proffer? THE  COURT:   Why don't you ask him how did he come to the bank to begin with. 2 The Assistant United States Attorney. 3 Mulinelli's counsel. -17- Q. (Mr. Abreu) Sir, how did you get to First Federal Savings to the loan department as a dealer? A. It was through Mr. Alcocer. Q. Mr. Alcocer was one of the highest officers of the bank at that time, wasn't he? MS. DOMINGUEZ: Objection as to relevance. THE COURT: It think it's irrelevant. Sustained. MR. ABREU: May I make a proffer as to a line? THE COURT: Well, perhaps you should approach the bench and make a proffer. (Bench conference.) MR. ABREU: Your Honor, the proffer is the following: The regular practice in First Federal was sending young people to recruit dealers.   In  this particular case he came from one  of  the  highest officer[s] of the bank, who collected his information about the corporation to the department. He highly recommended [Exposito], said he had an excellent credit, and that's how he got -- that's how they trusted him. THE COURT: It is total[ly] irrelevant to the issues of this case. This is a very discreet,  unique, well-defined conduct that is the object of these charges. Has nothing to do with Mr. Alcocer. Trial Transcript, Dec. 19, 1995, at 177-78. As we noted above, a defendant has a right to effective cross-examination. Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).   Once  that  constitutional threshold has been met, the trial court  "retain[s] wide latitude to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's -18- safety, or interrogation that is repetitive or only marginally relevant." Id. The question before us is whether the district court judge "exceeded his powers to limit cross-examination." United States v. Malik, 928 F.2d 17, 19 (1st Cir. 1991). In this case, we find that the district court exceeded the boundaries of its power and deprived Mulinelli of her ability to present her theory of defense to the jury. The information presented by Mulinelli in her opening statement and her proffer adequately indicated to the district court  the  theory  of  defense she wanted to pursue. She mentioned in her opening statement that "[t]he evidence will show that he (Exposito) was recommended by this highest officer of the bank," which  suggests that the person with whom Exposito might have acted to defraud the bank was not Mulinelli, but Alcocer, and at the least that Mulinelli was influenced by the recommendation of Alcocer. Such a theory of defense might suggest that, although Mulinelli may have been negligent in relying on Alcocer's recommendation and not questioning Exposito's loan applications more closely than she did, she had no knowledge of Exposito's fraudulent  transactions.  The information presented to the district court adequately apprised the court of the relevance of the channels  through  which  Exposito's loans were brought to Mulinelli's attention, and the court, by foreclosing the introduction of any testimony to support Mulinelli's theory of defense, violated Mulinelli's  Sixth  Amendment right to confrontation. We next review this error for harmlessness. -19- On direct appeal, we apply the harmless error standard set  forth  in  Chapman v. California, which requires that we reverse the conviction unless the government can prove that the constitutional error complained of was "harmless beyond a reasonable doubt." Chapman, 386 U.S. 18, 24 (1967); see also United States v. Maguire, 918 F.2d 254, 266 (1st Cir. 1990) (ordering a new trial where government failed to show constitutional errors were harmless beyond a reasonable doubt). Under this standard, we may not declare a constitutional error harmless if there is a "reasonable possibility" that the error influenced  the  verdict.   See United States v. Levy-Cordero, 67 F.3d 1002, 1015 n.15 (1st Cir. 1995) (holding that district court's failure  to  hold  an  evidentiary hearing into validity of defendant's proposed defense "was not 'harmless beyond a reasonable doubt' because there is a 'reasonable possibility' that exclusion of the proffered alibi evidence influenced the jury's verdict"). On the particular counts that involved the Exposito transactions, the government's proof of Mulinelli's knowledge relied solely on the testimony of Exposito. While documentary evidence was presented to support Exposito's acquisition of these loans,  that  evidence did not necessarily corroborate his testimony that Mulinelli encouraged him to apply for the loans or that she set the terms of the loans. The alternative version of events -- that Exposito was brought to the bank by the officer and that the officer  vouched for him -- would not necessarily have contradicted Exposito's  testimony on direct examination but would have provided -20- Mulinelli  with  the  opportunity to develop her own theory of defense against these two counts. The  Sixth  Amendment, and thus the constitutional minimum that must be allowed a criminal defendant before a trial court's discretion  to  limit  cross-examination adheres, includes the ability to develop and present a defense. See United States v. Muhammad, 928 F.2d 1461, 1467 (7th Cir. 1991) (holding that only after satisfying the constitutional minimum of allowing a defendant to present sufficient evidence for the jury to assess her theory of defense and witness bias does the district court's discretion to limit cross-examination inure); see also Washington v. Texas, 388 U.S. 14, 18 (1967) ("'A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense -- a right to his day in court -- are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented  by counsel.'" (quoting In re Oliver, 333 U.S. 257, 273 (1948)). The district court's ruling worked a severe restriction on  Mulinelli's  ability  to elicit evidence relating to her theory of defense.   Had the jury been presented with the theory, it may well have accepted it and believed that Exposito's testimony was not credible. As Exposito's testimony was the prosecution's only evidence regarding Mulinelli's knowledge, the error of excluding her theory of defense could not have been harmless, and warrants reversal with regard to the loan transactions with Exposito. We -21- therefore  vacate Mulinelli's conviction and sentences4 CONCLUSION affirm in part and vacate and remand in part. 4 on Counts 5 and 6 and remand to the district court for further proceedings in conformity with this decision. For the foregoing reasons, we  We note, however, that this outcome will not ultimately change Mulinelli's sentence. Her original base offense level was six, increased  eight levels under U.S.S.G. 2F1.1(b)(1) because the loss was  determined  to  be  $349,000. The level was further increased two levels in accordance with U.S.S.G. S 2F1.1(b)(2) because the offense involved more than minimal planning and two levels in accordance with U.S.S.G. S 3B1.3 because Mulinelli abused a position  of  trust. Her sentence, based on these calculations, was 27 months for all six counts, to be served concurrently. The calculations  remain  the  same, even after the loss from Counts 5 and 6 ($130,000) is excluded, because the district court enhanced for an amount of loss over $200,000 under U.S.S.G. S 2F1.1(b)(1), and the total loss for Counts 1 through 4 remains over $200,000.  -22-